# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3537

_____

Jill Tilley,                                             *
                                                         *
                    Appellant,                           *    Appeal from the United States
                                                         *    District Court for the
        v.                                               *    Eastern District of Arkansas.
                                                         *
Michael J. Astrue, Commissioner                          *
of Social Security Administration,                       *
                                                         *
                    Appellee.

_____

Submitted: April 15, 2009
    Filed: September 1, 2009

_____

Before WOLLMAN, MELLOY, and GRUENDER, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

        Jill Tilley appeals from the district court's judgment affirming the denial of her application for disability insurance benefits pursuant to Title II of the Social Security Act, 42 U.S.C. § 401, et seq. We reverse and remand.

## I. Background

        To qualify for disability insurance benefits, Tilley was required to establish that she was disabled before her insurance expired on September 30, 1998. See 42 U.S.C. § 416(i) (defining the terms "disability" and "period of disability"); § 423(a)

(describing who is entitled to disability insurance benefits); see also Moore v. Astrue, 572 F.3d 520, 522 (8th Cir. 2009) (Claimant must "establish her being disabled prior to the expiration of her insurance to be entitled to disability insurance benefits"). Thus the relevant time period is from her alleged disability onset date, March 1, 1998, until the date her insured status expired, September 30, 1998.

## A. Personal History

Tilley was born on March 21, 1944. She is a high school graduate and has completed some college courses. From 1978 to 1991, Tilley worked in food services as a cafeteria worker. She was fired when she was no longer physically able to perform her job. Tilley has not engaged in substantial gainful activity since her alleged disability onset date, though she worked from 2001 through 2003 as a product demonstration person, handing out samples to customers at a Walmart store. In that position, Tilley worked either one day a week or every other weekend for six hours on Saturday and six hours on Sunday. She testified that after working her weekly shift, "it'd take me nearly another week to get healed up to go back and do that one Saturday." Admin. R. at 728.

Tilley alleges that she became disabled due to fibromyalgia, hypoglycemia, hypertension, and degenerative changes of the cervical and lumbar spines. In 1983 and 1991, Tilley underwent surgery of the cervical spine. The first surgery was successful and alleviated her left upper extremity pain. Her second surgery was less so, and Tilley continued to suffer from back, neck, and right arm pain.

Tilley completed Social Security Disability Supplemental Interview Outlines in October 2002 and August 2003. She reported that her pain was located in her lower back, her neck, and her right side (shoulder, arm, and leg) and that it would subside only when her medications took effect. She could not engage in activities that required repetitive motion or heavy lifting. Tilley's ability to complete household

chores was limited, but she could launder clothes, wash dishes, change sheets, prepare simple meals, and complete short errands. Even though she was able to complete those household tasks, things like cleaning, cooking, standing, driving, and working caused pain or other symptoms. Other than attending church, Tilley's recreational activities were solitary and sedentary; she no longer visited friends or family.

At her 2005 hearing before an administrative law judge (ALJ), Tilley testified that her condition was about the same as it was in 1998, although in 1998 she was taking more pain medication—four to six Darvocet[1] each day—and receiving trigger point injections in her lower back, neck, shoulder, and arm. She testified that she felt "real tired and draggy" and that her medications upset her stomach and some made her "a little woozy." Admin. R. at 737, 730. Tilley's hypoglycemia was troubling her in 1998, and she "was throwing up, dizzy, couldn't stand up straight."[2] Id. at 736. Tilley also testified that she has suffered hearing loss, that she has pain from fibromyalgia, and that she takes medication to manage her high blood pressure.

Tilley's testimony concerning her daily activities was consistent with the information she provided in the interview outline. She explained that she does light housework and that her husband does the vacuuming, sweeping, and mopping. Tilley's husband also makes breakfast, while she might microwave something for lunch and make a sandwich or a bowl of cereal for supper. Tilley testified that she goes to bed around 11:00 p.m. because being in bed for too long causes pain and she often is unable to sleep through the night, despite being on medication to assist her in doing so. Once a week, Tilley teaches a children's Bible study class at the church she attends. She rarely drives, and when she does, it is for a short distance (three to four

---

[1]Darvocet is a narcotic pain medication indicated for the relief of mild to moderate pain. Physician's Desk Reference 3497 (60th ed. 2006).

[2]Tilley testified that she became diabetic after losing weight.

miles).  She watches television and reads short magazine articles, but she no longer has any hobbies.

## B.  Medical History

In February 1991, Randy Roberts, M.D., diagnosed Tilley with fibromyalgia and osteoarthritis.  Tilley had been having problems sleeping due to back and neck pain on her right side.  Dr. Roberts found that her neck had lost about ten degrees rotation on either side, and a cervical spine x-ray revealed significant osteoarthritis.  Despite repeated treatment for pain in her back and neck, Tilley's condition did not improve, and she underwent the second surgery on her cervical spine.  Dr. Roberts continued to treat Tilley for pain and hypoglycemia through 1996.  Darrell Ragland, M.D., began treating Tilley in 1994.

Throughout 1997 and 1998, Dr. Ragland and William Hurst, D.O., treated Tilley repeatedly for fibromyalgia and for pain in her back, neck, joints, and right side.  Her treatment included trigger point injections, Darvocet and Trilisate[3] for pain, either Soma[4] or Flexeril[5] for muscle relaxation and sleep, Trazodone[6] for sedation, either

---

[3]Trilisate is a nonsteroidal, anti-inflammatory preparation and is prescribed for osteoarthritis, rheumatoid arthritis, and acute painful shoulder.  Physicians' Desk Reference 2846-48 (58th ed. 2004).

[4]Soma is prescribed to relieve discomfort associated with acute, painful musculoskeletal conditions.  Physicians' Desk Reference 1931-33 (63d ed. 2009).  Soma may have sedative properties.  Id. at 1931.

[5]Flexeril is prescribed to relieve skeletal muscle spasms associated with acute, painful musculoskeletal conditions.  Physicians' Desk Reference 1832-33 (60th ed. 2006).

[6]Trazodone is prescribed for treatment of depression.  Physicians' Desk Reference 520-22 (49th ed. 1995).

Tenex or Hyzaar[7] for hypertension, and Premarin[8] for hormone replacement. In July 1997, Dr. Hurst treated Tilley for "persistent fibromyalgia type pain that has been very debilitating" and adjusted her medications to try to find a more effective treatment. Admin. R. at 447. Tilley had hung wallpaper a few days earlier, and Dr. Hurst remarked that the activity "could cause some of this soreness" that Tilley was experiencing in her right arm, right leg, and neck. Id.

In his treatment notes following an office visit in January 1999, Dr. Ragland noted that Tilley had been working in the deli at Walmart, but was resigning that day because the work was too difficult.

By letter dated January 4, 2008, Dr. Ragland opined that Tilley could no longer work:

> Jill Tilley is a patient that I have followed for many years who carries the diagnosis of degenerative arthritis, fibromyalgia, diabetes type 2, hypertension, and generalized anxiety. These conditions have worsened to the point that I believe that she is unable to continue to work. She is maintained on several different medications, and these medications have been adjusted in an attempt to control her pain better, but without much success. She is maintained on glucophage, flexeril, maxide, actonal, trazadone, lotension, glucotrol, and some prn darvocet.

Id. at 200.

---

[7]Tenex and Hyzaar are indicated for the treatment of hypertension. Mosby's 2002-2003 Medical Drug Reference 477-78 (2002) (Tenex); Physicians' Desk Reference 1996-2001 (64th ed. 2008) (Hyzaar).

[8]Premarin is prescribed for hormone replacement. Physicians' Desk Reference 3221-28 (63d ed. 2009).

Dr. Ragland also completed a medical source statement assessing Tilley's physical capabilities from 1998 to June 2004. He opined that she could frequently and occasionally lift and/or carry less than ten pounds; that she could stand and/or walk for a total of two hours, continuously for fifteen minutes; and that she could sit for a total of eight hours, continuously for one hour. He reported that she had a limited ability to use hand or foot controls; that she should never climb, balance, or crouch; and that she could occasionally stoop, kneel, and bend. Her reaching, fingering, feeling, hearing, and speaking were unlimited, but her handling and sight were limited. Dr. Ragland remarked that Tilley "drops items due to [range of motion] neck loss." Id. at 199.

## C. Administrative History

Tilley filed for disability insurance benefits in August 2003, and her claim was denied initially and on reconsideration. A vocational expert testified at the 2005 hearing that Tilley's past relevant work in food service constituted light, semi-skilled work.

The ALJ undertook the familiar five-step test to determine whether Tilley was disabled as of September 30, 1998.[9] The ALJ found that Tilley met the first two steps of the analysis: she had not engaged in substantial gainful activity since the alleged onset of disability date, and her impairment was severe. Because her impairment did not meet or equal those listed in the Social Security regulations, the ALJ proceeded to the fourth step, which asks whether Tilley could perform her past relevant work.

---

[9]The five steps are: (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to her past relevant work; and (5) whether the claimant can adjust to other work in the national economy. 20 C.F.R. § 404.1520(a)(5)(i)-(v).

The ALJ found that Tilley had the residual functional capacity to perform light work[10] as of the date last insured and thus could have returned to her work in food services. Accordingly, the ALJ determined that she did not meet the Social Security Act's definition of disabled and denied her claim for benefits.

In concluding that Tilley could perform her past relevant work, the ALJ rejected Dr. Ragland's opinion, discrediting it based on Tilley's activities prior to and immediately following the last date of insurance coverage.

## II. Analysis

We review *de novo* the district court's decision affirming a denial of Social Security benefits. Minor v. Astrue, No. 08-3375, 2009 WL 2244597 at *1 (8th Cir. July 29, 2009). We affirm the denial of such benefits when the substantial evidence on the record as a whole supports the ALJ's decision. Id. This standard requires a more searching review than the substantial evidence standard, and we take into account record evidence that fairly detracts from the ALJ's decision. Id. "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Id. (citations omitted). "Reversal is not warranted, however, 'merely because substantial evidence would

---

[10]The Social Security regulations state:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

have supported an opposite decision.'" Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)).

The issue before us is whether there is substantial evidence based on the record as a whole to support the ALJ's conclusion that Tilley could have performed her past relevant work in food services as of September 30, 1998. The answer turns on whether it was appropriate to discredit the opinion of Tilley's treating physician, Dr. Ragland.

Tilley argues that the ALJ's failure to give controlling weight to the opinion of her treating physician contradicted the rules established in 20 C.F.R. § 404.1527 and SSR 96-2p. A treating physician's opinion is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record." 20 C.F.R. § 404.1527(d)(2); see also SSR 96-2p, 1996 WL 374188, at *2 (Social Security Administration, July 2, 1996) (When a treating source renders a medical opinion that is well supported by medically acceptable diagnostic techniques and consistent with the other substantial evidence in the claimant's record, "the adjudicator must adopt a treating source's medical opinion irrespective of any finding he or she would have made in absence of the medical opinion."). The record must be evaluated as a whole to determine whether the treating physician's opinion should control. Reed, 399 F.3d at 920. The regulations require the ALJ to "always give good reasons" for the weight afforded to the treating source's opinion. 20 C.F.R. § 404.1527(d)(2).

Dr. Ragland's opinion that Tilley cannot perform light work is consistent with the evidence in the administrative record. Tilley testified that she was first diagnosed with fibromyalgia by Dr. Miller, who performed Tilley's cervical spine surgery in 1983. Tilley's medical records indicate that Dr. Roberts, Dr. Ragland, and Dr. Hurst diagnosed and treated her for fibromyalgia and degenerative spine issues. The records

from the relevant time period document her repeated reports of pain, much of which the doctors attributed to fibromyalgia, as well as her back and neck problems. Both Dr. Ragland and Dr. Hurst prescribed trigger point injections, narcotic pain medications (including Darvocet), and sleep aides and muscle relaxers (including Soma and Flexeril). Tilley's substantial pain management medications lend further support to Dr. Ragland's opinion.

The ALJ did not rely on conflicting or inconsistent medical assessments to discredit Dr. Ragland's opinion. This is not a case in which different treating doctors have offered varied opinions. See Hamilton v. Astrue, 518 F.3d 607, 611-12 (8th Cir. 2008) (treating doctor's opinion conflicted with another doctor's treatment notes); Casey v. Astrue, 503 F.3d 687, 692-93 (8th Cir. 2007) (treating rheumatologist's opinion inconsistent with other doctors' treatment notes). Dr. Hurst's treatment notes are fully consistent with Dr. Ragland's opinion. For example, in 1997, Dr. Hurst diagnosed Tilley with hypertension (controlled), dyspepsia, fibromyalgia, and right lumbar strain, noting that "there is some exquisite tenderness and a couple of triggerpoints noted in the lower thoracic muscles in the right paravertebral musculature. The patient can heel walk and toe walk well but there is persistent right hip and right lumbar pain at examination." Admin. R. at 454. Moreover, the ALJ did not rely on a consultative physician's assessment to discount Dr. Ragland's opinion.[11] Cf. Hamilton, 518 F.3d at 611-12 (concluding that the findings of consultative doctor served as some evidence to discredit the opinion of the treating doctor's opinion); see also Moore, 572 F.3d at 523-24 (concluding that one consulting physician's residual functional capacity assessment supported the ALJ's finding when claimant provided no contrary assessment). The only substantiated medical opinion in this case is Dr.

---

[11]In 2003, state agency physician Steve Owens, M.D., completed a residual functional capacity assessment, concluding that Tilley had the ability to perform medium work activity. Dr. Robert Redd affirmed Dr. Owen's assessment. The ALJ assigned little weight to the assessment because "the formulation was reached without benefit of testimony and current medical documentation." Admin. R. at 16.

Ragland's, and his opinion is consistent with Tilley's medical records from the relevant time period. Cf. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) (treating physicians' conclusory and inconsistent opinions properly discounted); Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001) (inconsistent and unsupported portions of the treating physician's medical source statements properly discounted).

We disagree with the Commissioner's argument that the facts in Tilley's case are comparable to those in Krogmeier v. Barnhart, 294 F.3d 1019 (8th Cir. 2004). In Krogmeier, the treating psychiatrist rendered an opinion in 1997 that the claimant was disabled prior to his date last insured, December 31, 1994. Id. at 1023. The psychiatrist's treatment notes from the relevant time period, however, told a different story, stating that the claimant "was '1000% better,' 'back to his old self,' and 'well-maintained.'" Id. After considering the medical records, the opinion of a consulting physician, the claimant's lack of motivation to return to work, and his testimony regarding his daily activities, the ALJ determined that the claimant was capable of some work. Id. at 1024. We concluded that substantial evidence in the record supported the ALJ's decision. Id. Like the treating physician's opinion in Krogmeier, Dr. Ragland rendered his opinion that Tilley was disabled years after her date last insured. Unlike the facts in Krogmeier, however, Dr. Ragland's treatment notes from the relevant time period were entirely consistent with his 2004 opinion and medical source statement.

An incomplete description of Tilley's activities provided the sole basis for the ALJ's dismissal of Dr. Ragland's opinion. The decision stated that Tilley "was able to hang wall paper in 1997, work at Wal-Mart in 1999 and as a census taker in 2000; and care for her husband who was ill in 2003." Admin. R. at 15. Notably, Tilley's medical records disclosed these activities, as each resulted in a visit to the doctor's office. Following Tilley's activity of hanging wallpaper, Dr. Hurst treated her for persistent, debilitating fibromyalgia pain in her right arm, right leg, and neck and adjusted her medication in an attempt to find an effective treatment. Similarly, Dr.

-10-

Ragland's medical notes indicate that Tilley's ailments forced her to resign from her short-lived employment at the Walmart deli in 1999. Tilley returned to Dr. Ragland after her brief stint as a census taker and was administered trigger point injections for shoulder pain and numbness in her fingers on her right hand. And after the stress of caring for her ailing husband in 2003 left Tilley feeling tired with pain in her neck and shoulders, Dr. Ragland increased her prescribed dosage of Flexeril. This history, when viewed in its full context, supports Dr. Ragland's conclusion that Tilley was unable to perform light work, and her unsuccessful attempts to engage in gainful employment do not discredit his opinion.

Tilley's ability to engage in some life activities, despite the pain it caused her, does not mean she retained the ability to work as of the date last insured. See Forehand v. Barnhart, 364 F.3d 984, 988 (8th Cir. 2004) ("[W]e have held, in the context of a fibromyalgia case, that the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to engage in substantial gainful activity." (quoting Brosnahan v. Barnhart, 336 F.3d 671, 677 (8th Cir. 2003))). The ALJ's decision did not address the difficult diagnoses of fibromyalgia and degenerative spine changes, nor did it acknowledge Tilley's physical limitations. Fibromyalgia is an elusive diagnosis; "[i]ts cause or causes are unknown, there's no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996). Tilley has been diagnosed with fibromyalgia repeatedly, and her complaints correspond directly with the disorder's characteristics: "chronic widespread aching and stiffness, involving particularly the neck, shoulders, back, and hips, which is aggravated by the use of the affected muscles." Stedman's Medical Dictionary 725 (28th ed. 2006). Her limited ability to complete light housework and short errands does not mean she has "the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc).

-11-

We conclude that the treating physician's opinion was improperly discredited and that the finding that Tilley can perform her past work as a food service worker is not supported by substantial evidence on the record as a whole. We thus vacate the judgment and remand to the district court with instructions to remand the case to the Social Security Administration for further consideration consistent with this opinion.

_____