# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1717
_____

Regina K. Dipple,

        Appellant,

v.

Michael J. Astrue, Commissioner
of Social Security,

        Appellee.

\*
\*
\*
\*  Appeal from the United States
\*  District Court for the
\*  Southern District of Iowa.
\*
\*
\*
\*

_____

Submitted: January 13, 2010
Filed: April 14, 2010

_____

Before LOKEN,[1] Chief Judge, JOHN R. GIBSON, and WOLLMAN, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Regina Dipple appeals from the district court's[2] order affirming the final decision of the Commissioner of the Social Security Administration, which denied

_____

[1]The Honorable James B. Loken stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2010. He has been succeeded by the Honorable William Jay Riley.

[2]The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa.

Dipple's application for disability insurance benefits and supplemental social security income. We affirm.

## I.

To qualify for disability insurance benefits, Dipple was required to prove that she was disabled prior to the expiration of her insured status. 42 U.S.C. §§ 416(i), 423(a); Tilley v. Astrue, 580 F.3d 675, 676 (8th Cir. 2009). Thus, the relevant period is from her alleged disability onset date, March 1, 2001, until the date her insurance status expired, December 31, 2003. Tilley, 580 F.3d at 676.

On September 19, 1997, Dipple was working as a traffic flagger on a highway construction site near Viola, Illinois. She was struck by a passing car and thrown a considerable distance. Dipple was treated in an emergency room and received computerized tomography scans of her head and back. The scan results were negative for anatomic abnormalities, and Dipple was released that day with prescriptions to relieve pain and prevent infection. After being off work for three months, Dipple returned to her construction employment for only four hours. She then obtained work as a bartender. According to Dipple, she experienced memory problems that interfered with that job and she ceased working as a bartender in 2001.

From 1998 to 2001, Dipple visited Family Physicians Clinic in Davenport, Iowa, for annual examinations. The clinic's reports indicate that Dipple complained of a sore breast, cough, diarrhea, and cellulitis. In August 1998, Dipple was examined by a plastic surgeon, who documented a scar on her forehead and some residual elevation of her left eyebrow. The surgeon reported that no further treatment was required.

In October 2004, Dipple filed an application for disability benefits, alleging that her disability began in March 2001. She claimed that she had been unable to work

because of back and neck pain, hip and leg injuries, dizziness, mood changes and memory loss, all stemming from her 1997 accident. Dipple's medical records were limited, and the Social Security Administration requested physical and psychological examinations. Stanley Rabinowitz, M.D., reported that Dipple complained of joint and back pain and memory problems, but found Dipple to be "within normal limits" neurologically. Lori O'Dell McCollum, Ph.D., a psychologist, found that Dipple exhibited short and intermediate memory impairment but no long-term memory problems. Dr. McCollum concluded that Dipple could work at a slow pace and that her Global Assessment of Functioning score was sixty-five. Based upon these findings, the administration determined that Dipple lacked a medically determinable impairment and that she was not entitled to disability benefits.

Dipple appealed this initial determination and a hearing was held before an administrative law judge (ALJ) in March 2007. The ALJ determined that an additional psychological evaluation was appropriate, and Phillip Kent, Psy.D., a psychologist, examined Dipple in April 2007. Dr. Kent confirmed that Dipple experienced problems with her attention span, although she exhibited no difficulties managing her daily life or making "reasonable life decisions." Dipple showed "some signs of emotional disinhibition, attention problems with mental calculations, spatial confusion and concrete thinking." Dr. Kent believed that Dipple's symptoms were "consistent with an individual who likely sustained a closed head injury," although "the neurological tests at the time were normal." He diagnosed Dipple with a cognitive disorder not otherwise specified, alcohol abuse by history, a depressive disorder not otherwise specified, and dependent personality traits.

At a second administrative hearing in June 2007, the ALJ considered Dr. Kent's report and the testimony of a vocational expert. The vocational expert testified that an individual with Dipple's impairments could function as a housekeeper, hand packer, or kitchen helper. He opined that there were tens of thousands of such jobs in Illinois and Iowa. The ALJ conducted the five-step test required to determine

whether Dipple was disabled as of December 31, 2003, determining (1) whether Dipple was engaged in substantial gainful activity; (2) whether Dipple had a severe impairment; (3) whether the impairment met or equalled an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether Dipple could return to her past relevant work; and (5) whether Dipple could adjust to other work in the national economy. 20 C.F.R. § 404.1520(a)(5)(i)-(v); Tilley, 580 F.3d at 679 n.9. The ALJ determined that Dipple met the first three of these requirements but did not have an impairment that met or medically equalled the listed impairments of 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ found that Dipple had a residual functional capacity to perform medium work, and that she required unskilled work with simple repetitive tasks not dependent upon significant memorization. The ALJ found that significant numbers of suitable jobs for Dipple existed in the national economy. Accordingly, the ALJ concluded that Dipple was not disabled from March 1, 2001 to the date of the decision, July 12, 2007, and thus not entitled to disability benefits.

## II.

We review *de novo* the district court's order upholding the denial of social security benefits, and we will affirm if the decision of the Social Security Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g); Stormo v. Barnhart, 377 F.3d 801, 805 (8th Cir. 2004).

## A.

Dipple argues that the ALJ's findings were unsupported by the evidence. She argues that (1) the ALJ's determination of her residual functional capacity failed to give adequate consideration to Dr. Kent's report, and (2) the vocational expert failed to provide substantial evidence of significant numbers of jobs that Dipple could realistically perform.

The opinion of a treating physician is accorded special deference and will be granted controlling weight when well-supported by medically acceptable diagnostic techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000). Dr. Kent, as a consultative psychologist, based his conclusions upon the assumption that Dipple had been thrown hundreds of feet in the 1997 accident[3] and his opinion did not square with the evaluations of Dr. Rabinowitz and Dr. McCollum, also acting in a consultative capacity. It was the ALJ's task to resolve the differences between these consultative evaluations in the light of the objective evidence. The objective evidence showed that Dipple demonstrated only limited impairments, could complete simple tasks, and lacked significant social dysfunction. In sum, the ALJ adequately considered Dr. Kent's report and explained her reasoning for disagreeing with Dr. Kent's conclusions.

Once it is established that the claimant cannot return to her previous occupation, the Commissioner bears the burden to show that a significant number of appropriate jobs exist for the claimant. 42 U.S.C. § 423(d)(2)(A); Johnson v. Chater, 108 F.3d 178, 180 (8th Cir. 1997). The vocational expert identified several jobs that Dipple could perform and testified that there were thousands of such jobs in Illinois and Iowa. Dipple argues that this testimony was insufficient because it did not specify how many of these jobs were full-time, rather than part-time work. The vocational expert was neither required to articulate the percentage of available jobs that were part-time or full-time, nor to describe labor market conditions beyond the data that were readily available. Liskowitz v. Astrue, 559 F.3d 736, 745 (7th Cir. 2009). Accordingly, the vocational expert's testimony constituted substantial evidence that there were jobs available for Dipple.

---

[3]A newspaper report of the accident stated that Dipple was "thrown about 500 feet." The police report indicated that Dipple was struck by a vehicle traveling at thirty-five miles per hour. The diagram of the accident on the police report shows Dipple as having been thrown approximately two car lengths.

B.

Dipple also argues that the ALJ failed to adequately assess her credibility. In assessing a claimant's credibility, the ALJ must consider all of the evidence relating to the subjective complaints, the claimant's work record, observations of third parties, and the reports of treating and examining physicians. 20 C.F.R. § 404.1529(c)(3); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ should consider the claimant's daily routine; duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski, 739 F.2d at 1322. When rejecting a claimant's complaints of pain, the ALJ must make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors. Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998).

The ALJ noted that Dipple was released from the hospital on the same day that she was admitted and that documentation of ongoing neurological complaints was lacking. The ALJ considered Dipple's subjective complaints of pain and found that Dipple could lift twenty-five pounds frequently and that she could stand, walk, and sit six-to-eight hours at a time. The ALJ noted that the November 2004 psychological examination revealed no major dysfunction, and that Dipple's long-term memory was intact. The ALJ also considered the results of Dr. Kent's April 2007 examination. During this examination, Dipple related that she has a fairly normal daily routine, including accomplishing basic household tasks and playing cards with neighbors on a regular basis. Additionally, Dipple works on her computer and reads. The ALJ concluded that "These are not the actions of an individual who has 'marked' limitations in the ability to perform simple, repetitive tasks."

The ALJ also explained why she rejected Dipple's complaints of social impairment. Dipple continued to interact successfully with her family and neighbors.

There was no evidence of significant problems with social interaction. Accordingly, the ALJ found that Dipple had no more than a "slight" limitation in social functioning.[4]

We conclude that the ALJ made adequate findings with respect to Dipple's credibility. An express credibility determination was not required because the ALJ did not reject Dipple's subjective complaints of pain, but rather discounted Dipple's account of her cognitive and social impairments. See Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991) (limiting the requirement of an express credibility determination to instances in which an ALJ rejects "a claimant's subjective allegations of pain"); Ricketts v. Sec'y of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990) (same). The ALJ gave appropriate credence to Dipple's cognitive and social complaints and considered them in light of all of the relevant information, detailing the reasons why Dipple's testimony was discounted, setting forth the material inconsistences, and discussing the relevant Polaski factors. Thus, the ALJ's decision makes sufficiently clear the areas in which Dipple's credibility was questioned.

III.

The judgment is affirmed.

_____

_____

[4]We have considered and find to be without merit Dipple's contention that the ALJ did not adequately consider her "deficiencies in persistence and pace."